

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-09-098-CR

MARLON TYRONE ROBERSON                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

------------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Marlon Tyrone Roberson appeals his conviction for theft from a person. In two points, Roberson argues that the trial court erred by not suppressing identification evidence and that the evidence is legally and factually insufficient to prove identity. We will affirm.

### II. FACTUAL AND PROCEDURAL BACKGROUND

---

[1] *See* Tex. R. App. P. 47.4.

On May 14, 2008, Cindy Miller was working at a Metro PCS store in Fort Worth when she observed an individual, whom she later identified as Roberson, enter the store and hand her a note. Roberson was wearing a blue shirt with white stripes, a hat, and sunglasses. Miller saw the word "robbery" in the note, handed the note back to Roberson, and turned over about $200 to him. Roberson ran out of the store just as Shin Kim, the manager, was entering the store. Miller told Kim that she had been robbed, and Kim turned around and chased Roberson. After alerting the employees of a nearby business that she had been robbed, Miller entered her vehicle to search for Kim and called 911.

Jerry Griffith, a customer of the Metro PCS store, happened to be driving by the store when he saw Kim chasing an individual, whom Griffith later identified as Roberson, and yelling, "Please give me my money back." Griffith grabbed his Taser and joined the chase, eventually catching up with Kim. Kim and Griffith caught up with and confronted Roberson after he had jumped a fence into a backyard and ran to a gate, which was locked. Griffith "zapped" his Taser a few times and told Roberson to turn over the money. Roberson threw the money at Kim and Griffith, jumped over the fence, and ran off.

Miller picked Kim up in her car and headed back to the Metro PCS store. As Miller was waiting to cross a street, she observed Roberson, who was now wearing

a white shirt, peeking out from a hole in a wooden fence.[2]  Miller told the 911 operator that she had spotted the person who had robbed her. Meanwhile, Griffith, who was also making his way back to the Metro PCS store, saw Roberson run from the hole in the fence, across the street, and to a Cadillac that was parked next to an Italian restaurant.  Griffith observed Roberson look or reach into the Cadillac before running into the Italian restaurant.

Officer Carl Pollak was dispatched to the Metro PCS store.  Just before arriving at that location, an individual matching the suspect's description (black male, five-and-a-half-feet tall, weighing approximately 250 pounds) ran across the street and in front of Officer Pollak's patrol unit.  Officer Pollak had to brake hard to avoid hitting the person, whom he later identified as Roberson.  Officer Pollak observed Roberson run to a Cadillac and then into the Italian restaurant. Officer Pollak and another officer made their way to the Italian restaurant, where they found Roberson in a bathroom and arrested him.

Griffith observed the officers taking Roberson out of the Italian restaurant. An officer later escorted Griffith to a police unit, where Griffith identified Roberson, who was sitting inside the police unit, as the person he had seen coming out of the Metro PCS store and had chased, but Griffith noted that Roberson had removed his hat

---

[2] A police officer testified that the part of the fence with the "hole" in it looked like it had been knocked down or that it was a "pass-through."

and sunglasses and changed shirts.[3] Miller also observed officers taking Roberson out of the Italian restaurant, and an officer escorted her to the police unit, where she identified Roberson as the person who had taken the money at the Metro PCS store. The following day, a detective showed Miller a photographic lineup, and she identified Roberson as the person from the Metro PCS store. The detective testified at a hearing to suppress Miller's identification of Roberson that he was not familiar with the Department of Justice's "Study and Guide for Law Enforcement on Recommendations for Conducting Identification Procedures."

Officers walked the area where the chase had occurred and found a hat, sunglasses, and a blue-and-white striped shirt near a bush. The blue-and-white striped shirt was a "Roca Wear" brand shirt, size 5X. Officers also discovered a green-and-white striped shirt inside of the Cadillac that was a "Roca Wear" brand shirt, size 5X.

Roberson was charged with robbery, but a jury convicted him of theft from a person. The trial court, having found the enhancement allegations true, sentenced him to twenty years' confinement.

### III. IDENTIFICATION EVIDENCE

---

[3] The State refers to this procedure as a field showup. *See Pace v. State*, 986 S.W.2d 740, 743 (Tex. App.—El Paso 1999, pet. ref'd) (stating that a showup "is a police procedure where the actual victim of a crime or other witness is brought to a location to look at a suspect to see if the victim or witness can identify the suspect").

In his first point, Roberson argues that the trial court erred by overruling his motion to suppress Miller's and Griffith's in-court identifications of him. He contends that the in-court identifications were tainted by impermissible pretrial identification procedures that gave rise to a substantial likelihood of misidentification because both showups occurred at a police unit in which Roberson sat alone and under arrest, the detective who showed Miller the photographic lineup failed to follow identification procedures as set by the Department of Justice, both Miller and Griffith observed police escorting Roberson out of the Italian restaurant, Roberson was wearing sunglasses when Miller saw him for only one or two minutes and when Griffith saw him, and Miller identified Roberson based primarily on his body type instead of his face.

## A.    Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review de novo application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson v. State*, 68 S.W.3d 644, 652–53

5

(Tex. Crim. App. 2002). The point raised by Roberson—that the complained-of pretrial procedures were impermissibly suggestive and gave rise to a substantial likelihood of misidentification—is a mixed question of law and fact that we review de novo. *See Loserth v. State*, 963 S.W.2d 770, 772–73 (Tex. Crim. App. 1998).

In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App.), *cert. denied*, 519 U.S. 1043 (1996). However, when the parties consensually relitigate the suppression issue during the trial on the merits, we consider all evidence—from both the pretrial hearing and the trial—in our review of the trial court's determination. *Gutierrez*, 221 S.W.3d at 687. Here, the trial court denied Roberson's motion to suppress Miller's in-court identification of him after it had heard the testimony of Miller and an investigator with the Fort Worth Police Department. The trial court denied Roberson's motion to suppress Griffith's in-court identification after it had heard Griffith's testimony. The parties relitigated the suppression issue at trial; therefore, we will consider the evidence presented at both the suppression hearings and the trial.

**B.   Identifications**

We use a two-step analysis to determine whether the trial court was correct in admitting an in-court identification: (1) whether the pretrial identification procedure was impermissibly suggestive and, if so, (2) whether the suggestive pretrial procedure gave rise to a substantial likelihood of irreparable misidentification. *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 828 (2000); *Delk v. State*, 855 S.W.2d 700, 706 (Tex. Crim. App.), *cert. denied*, 510 U.S. 982 (1993). The appellant must show by clear and convincing evidence that the witness's in-court identification was so tainted. *Madden v. State*, 799 S.W.2d 683, 695–96 (Tex. Crim. App. 1990), *cert. denied*, 499 U.S. 954 (1991).

In determining whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification, we examine the totality of the circumstances. *Delk*, 855 S.W.2d at 706; *Madden*, 799 S.W.2d at 695. If the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, then subsequent identification testimony will be deemed reliable, and therefore admissible, as reliability is the linchpin in determining the admissibility of identification testimony. *Madden*, 799 S.W.2d at 695. The following five non-exclusive factors should be weighed against the corrupting effect of any suggestive identification procedure in assessing reliability: (1) the witness's opportunity to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the

witness's level of certainty at the time of confrontation, and (5) the time between the crime and confrontation. *Ibarra*, 11 S.W.3d at 195 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972)); *see Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008), *cert. denied*, 130 S. Ct. 72 (2009).[4]

### C. Miller's In-Court Identification

Assuming without deciding that the complained-of pretrial identification procedures were impermissibly suggestive, we move directly to the second prong of the inquiry and determine whether the alleged suggestive procedures gave rise to a substantial likelihood of irreparable misidentification. *See Winter v. State*, No. 14-08-01138, 2010 WL 605330, at *4 (Tex. App.—Houston [14th Dist.] Feb. 23, 2010, no pet.) (mem. op., not designated for publication); *Stokes v. State*, No. 03-02-00508-CR, 2003 WL 21401267, at *2 (Tex. App.—Austin June 19, 2003, no pet.) (mem. op., not designated for publication). The record shows that the theft occurred

---

[4] Roberson contends that "in light of the numerous, well publicized and quite startling evidence of known misidentifications, a reassessment and examination of the presently acceptable identification procedures should be considered." He directs us to a number of articles or publications and "calls upon the court to enter a judicial ruling imposing a standard to eliminate continued use of what all scholars on the subject agree is risky methodology." We decline Roberson's request. None of the articles or publications that he directs us to were admitted at trial. *See Perkins v. State*, 902 S.W.2d 88, 102 (Tex. App.—El Paso 1995, pet. ref'd) (holding that appellate court could not consider studies attached to appellant's brief because they were not introduced at trial). Further, as an intermediate appellate court, we are bound to follow the law declared by the court of criminal appeals on matters pertaining to the enforcement of criminal laws. *See Flores v. State*, 883 S.W.2d 383, 385 (Tex. App.—Amarillo 1994, pet. ref'd). The standards set forth above govern the admissibility of the complained-of identifications.

between 12:00 and 12:30 p.m. Miller testified that she saw Roberson just outside of the Metro PCS store before he entered the store and that she "got a look at him" when he was "in [her] face at the store." Roberson was wearing sunglasses and a hat and was in the store for "[n]o more than a minute or two," but Miller was able to see his body type and the parts of his face that were not covered by the sunglasses.

Miller saw Roberson a second time peeking through the hole in the fence. She observed that it was Roberson peeking through the fence even though he had removed his hat and sunglasses and was wearing a white shirt instead of the blue-and-white striped shirt that he wore at the Metro PCS store. Miller told the 911 operator that she had spotted the same person who had taken the money at the Metro PCS store.

Miller testified that before she went to the patrol unit to identify Roberson, she had had "numerous times to see" him and had told the police that the person they had taken out of the Italian restaurant was the same person who had robbed her. Miller recognized "the body build, the length of his height[,] and his face." When Miller identified Roberson at the patrol unit, she based the identification on her memory of Roberson from the Metro PCS store, even though she had observed officers taking Roberson out of the Italian restaurant.

Detective Lauren Tracy met with Miller the following day and showed her a photographic lineup that contained six photographs, including one of Roberson. Detective Tracy used photographs of individuals who resembled Roberson,

instructed Miller that the person being investigated may or may not be in the photographs, in no way suggested that Roberson was in the lineup, and did not say anything to Roberson after showing her the photographs. Miller identified Roberson within a matter of seconds as the person from the Metro PCS store. She testified that she was "a hundred percent sure" of her identification, which she based on the opportunities she had to observe Roberson at the Metro PCS store and peeking through the fence.

Each of the *Biggers* factors weighs in favor of finding that Miller's in-court identification was reliable: Miller had several opportunities to view Roberson; she exercised a high degree of attention to Roberson's appearance throughout the ordeal, recognizing that he had changed clothes between the time that he was at the Metro PCS store and the time that Miller saw him at the fence; she never offered conflicting descriptions of Roberson; her level of certainty regarding the identification was high; and the time between the crime and her identifications of Roberson at the patrol unit and in the photographic lineup was minimal. *See Biggers*, 409 U.S. at 199–200, 93 S. Ct. at 382. Accordingly, after reviewing the totality of the circumstances, we conclude and hold that Roberson did not show by clear and convincing evidence that the State's alleged impermissibly suggestive pretrial identification procedures (having Miller identify Roberson as he sat in the police unit and Detective Tracy's alleged failure to follow Department of Justice procedures in showing Miller the photographic lineup) gave rise to a substantial likelihood of

irreparable in-court misidentification by Miller. *See Ibarra*, 11 S.W.3d at 195. We overrule this part of Roberson's first point.

### D.   Griffith's In-Court Identification

Griffith testified that he saw Kim chasing Roberson from the Metro PCS store. He described Roberson at that point as "shorter than [him]" and wearing a hat, sunglasses, and a blue or red striped shirt. Griffith caught up with Roberson in a backyard and confronted him with a Taser. After Roberson discarded the money and jumped the fence, Griffith watched Roberson run away.

When Griffith was making his way back to the Metro PCS store, he saw Roberson run from the hole in the fence, across the street, and to a Cadillac that was parked next to an Italian restaurant. Griffith recalled that Roberson was no longer wearing sunglasses and a hat and was maybe wearing a white shirt instead of the striped shirt. He observed Roberson look or reach into the Cadillac before running into the Italian restaurant, and he described Roberson as being "in a big hurry."

Before police arrested Roberson, they detained a different person; but Griffith told police, "That's the wrong guy. [Roberson] just ran into the Italian [restaurant]." Griffith observed the officers taking Roberson out of the Italian restaurant, but he testified that his in-court identification of Roberson was based on his memory of seeing Roberson's face in the backyard. He could not recall if anyone showed him a photographic lineup.

11

The *Biggers* factors weigh in favor of finding that Griffith's in-court identification of Roberson was reliable. *See Biggers*, 409 U.S. at 199–200, 93 S. Ct. at 382. Accordingly, after reviewing the totality of the circumstances, we conclude and hold that Roberson did not show by clear and convincing evidence that the State's alleged suggestive pretrial identification procedures gave rise to a substantial likelihood of irreparable in-court misidentification by Griffith. *See Ibarra*, 11 S.W.3d at 195. We overrule the remainder of Roberson's first point.

## IV. EVIDENTIARY SUFFICIENCY—IDENTITY

In his second point, Roberson argues that the evidence is legally and factually insufficient to prove his identity as the person who took the money from the Metro PCS store. He contends that the "corrupt pre-trial identification procedure[s]" delineated in the first point negated Miller's and Griffith's in-court identifications of him and that the evidence is, therefore, legally and factually insufficient to prove identity. Having overruled Roberson's first point challenging the admissibility of Miller's and Griffith's in-court identifications, Roberson's second point, which is expressly contingent on our sustaining his first point, is accordingly unpersuasive. Further, under the appropriate standards of review,[5] we hold that the evidence is

---

[5] *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Steadman v. State*, 280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).

legally and factually sufficient to support Roberson's identity.   We overrule

Roberson's second point.

## V. Conclusion

Having overruled Roberson's two points, we affirm the trial court's judgment.


BILL MEIER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

LIVINGSTON, C.J. concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 3, 2010